## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **DIGNO PADRON, RAUL VALDEZ BANUELOS, AHMED YUSUF, MIGUEL ROSILES, EDISON RIOS BENAVIDES, OTONIEL RINCON VELASQUEZ, HECTOR RAMIREZ PICHADO,** on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) | CASE NO: |
| *Plaintiffs*, | ) ) | **COMPLAINT** |
| **v.** | ) ) | |
| **IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE), RICARDO WONG**, ICE FIELD OFFICE DIRECTOR (FOD) FOR CHICAGO AREA OF RESPONSIBILITY (AOR), **CHRISTOPHER L. MCDANIELS,** ICE CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE (COTR), **JOHN DOE,** ICE DETENTION SERVICE MANAGER (DSM), **ROBERT WHITE**, COUNTY BOARD CHAIRMAN FOR JEFFERSON COUNTY, ILLINOIS, **ROGER MULCH**, SHERIFF OF JEFFERSON COUNTY, ILLINOIS, **COUNTY OF JEFFERSON** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| in their official capacities, | ) ) ) | |
| *Defendants*. | ) ) ) ) | |

1

## STATEMENT OF THE CASE

1.     Plaintiffs complain of the detention of immigrants at the Jefferson County Justice Center (JCJC) by officials of Immigration and Customs Enforcement (ICE) of the United States Department of Homeland Security (DHS) and officials of Jefferson County, Illinois. Plaintiffs base their complaint on the chronic, deplorable conditions of confinement that have directly injured Plaintiffs and which threaten to injure them further, as well as on the continued use of the facility by ICE in spite of the facility's repeated deficiency ratings. On behalf of themselves and all others similarly situated, Plaintiffs seek injunctive and declaratory relief to prevent Defendants from housing immigrant detainees at JCJC while their health and safety would be at risk. Plaintiffs seek such relief under the Fifth Amendment to the U.S. Constitution, the DHS Appropriations Act of 2009 and its successors, the Administrative Procedures Act, 42 U.S.C. § 1983, and other applicable law.

2.     Plaintiffs are held in civil detention by ICE in various county jails in Illinois, Wisconsin, and Kentucky. Consistent with ICE policies and practices, Plaintiffs have been and will continue to be transferred among those facilities. Plaintiffs have been detained by ICE at JCJC, and Plaintiffs face a substantial likelihood of return to the facility.

3.      ICE routinely delegates the detention of immigrants in its custody to local county jails via contracts known as Inter-Governmental Service Agreements (IGSA). Congress has mandated that ICE cannot enter into contracts to detain individuals at facilities with conditions found to be repeatedly deficient. Further, the standard IGSA and ICE policies require adherence to the most current ICE-issued detention standards, the Performance-Based National Detention Standards (PBNDS), issued in 2011.

4.      ICE has an IGSA agreement with the Jefferson County Justice Center (JCJC) to hold immigrant detainees at the JCJC, which is located in Mount Vernon, Illinois.

5.      Defendants have been in violation of federal law regarding the conditions of confinement from the moment that JCJC housed its first immigrant detainee in April 2009. ICE entered into a contract with Jefferson County notwithstanding internal reports that found JCJC to be repeatedly "deficient." Further, JCJC does not adhere to and is not inspected under the 2011 PBNDS, in violation of the terms of the ICE contract with Jefferson County and ICE policy.

6.      During their civil detentionat JCJC, Plaintiffs were subjected to shocking conditions, including:  unsanitary, mold-encrusted showers and restrooms; brown, putrid drinking water; inadequate facility ventilation;

soiled and tattered prison uniforms; dangerously scarce medical care, and a woeful lack of ICE oversight of JCJC. The facility became a breeding ground for serious communicable diseases, including tuberculosis (TB) and Methicillin-resistant Staphylococcus aureus (MRSA), as well as respiratory infections and skin funguses.

7.     Despite the serious concerns with the detention conditions at Jefferson, the IGSA detention contract with Jefferson County has not been cancelled.

8.     As a result of JCJC's failure to adhere to appropriate standards, and ICE's failure to adequately inspect the facility, conditions at JCJC were allowed to remain so deplorable that on and after approximately November 30, 2012, ICE evacuated its detainees from JCJC.

9.     Upon information and belief, officials of Jefferson County and ICE intend that immigrant detainees will return to the facility as soon as in the month of March 2013.


## JURISDICTION AND VENUE

10.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to 42 U.S.C. § 1983 and 5 U.S.C. § 702 to secure injunctive and declaratory relief from Defendants' actions, which

violate the rights, privileges and immunities guaranteed to Plaintiffs by the Fifth Amendment to the United States Constitution, as made applicable to the states through the Fourteenth Amendment, federal statutory law, as well as other applicable law.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 1346(a)(2), and 28 U.S.C. § 1367(a).

12.     This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

13.     This Court has authority to grant injunctive relief in this action pursuant to 5 U.S.C. §§ 702, 706 and Rule 65 of the Federal Rules of Civil Procedure.

14.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1), 1391(b)(2), 1391(e). At least one defendant resides in the Northern District of Illinois and a substantial part of the events or omissions giving rise to the claims occurred in the district. The place of residence for the majority of named Plaintiffs is the Northern District of Illinois.

## PARTIES

15.     Digno Padron (Padron) is a lawful permanent resident, national of Cuba. He has been detained in the custody of ICE since November 2, 2012. Padron was detained at JCJC from approximately November 19 until November 29, 2012. While at JCJC, Padron contracted Methicillin-resistant Staphylococcus aureus, commonly referred to as "MRSA." He is currently detained at the Kenosha County Detention Center ("KCDC") in Kenosha, Wisconsin. Should ICE again send detainees to JCJC, he is likely to be returned to that facility.

16.     Raul Valdez Banuelos (Valdez) is a Mexican national. He was detained at JCJC from approximately mid-October 2012 until approximately the first week of December 2012. He received inadequate medical care at JCJC. He is currently detained at Kenosha County Detention Center in Kenosha, Wisconsin. Should ICE again send detainees to JCJC, he is likely to be returned to that facility.

17.     Ahmed Yusuf (Yusuf) is a lawful permanent resident, national of Nigeria. Yusuf has been in ICE custody from approximately August 2011 to the present. He was detained at JCJC from approximately August 2011 to October 2011 and then again for the majority of the month of November 2012. On November 30, 2012, Yusuf was transported out of JCJC with other

6

detainees, including two wearing face masks, and who are believed to have live tuberculosis (TB). He is currently detained at Tri-County Detention Center in Ullin, Illinois. Should ICE again send detainees to JCJC, he is likely to be returned to that facility.

18.     Miguel Rosiles (Rosiles) is a national of Mexico. Plaintiff Rosiles has been in ICE custody since September 25, 2007, nearly 5 years. He is HIV-positive. He was detained at JCJC on approximately 3 occasions. The most recent was from approximately May of 2012 until approximately November 30, 2012. Rosiles was transported out of JCJC with various individuals, including two wearing face masks, believed to have live TB. Plaintiff Rosiles is currently detained at Boone County Jail in Burlington, Kentucky. Should ICE again send detainees to JCJC, he is likely to be returned to that facility.

19.     Edison Rios Benavides (Rios) is a Colombian national.  He was detained for approximately two months at JCJC, from mid-October to mid-December 2012.  During this time, Rios became ill with flu-like symptoms. He received inadequate medical care at JCJC. He is currently detained at Kenosha County Detention Center in Kenosha, Wisconsin. Should ICE again send detainees to JCJC, he is likely to be returned to that facility.

20.    Otoniel Rincon Velasquez (Rincon) is a Mexican national.  He was detained at JCJC for approximately the month of November 2012.  He received inadequate medical care at JCJC.  He is currently detained at Tri-County Detention Center in Ullin, Illinois. Should ICE again send detainees to JCJC, he is likely to be returned to that facility.

21.    Hector Ramirez Pichado (Ramirez) is a Mexican national.  He was detained at JCJC for approximately ten days, from late November until early December 2012. While at JCJC, he was erroneously diagnosed with TB and kept in solitary confinement for approximately one week.  He is currently detained at Kenosha County Detention Center in Kenosha, Wisconsin. Should ICE again send detainees to JCJC, he is likely to be returned to that facility.

22.    Defendant U.S. Immigration and Customs Enforcement (ICE), is the federal agency within the Department of Homeland Security with responsibility over the detention of non-citizens charged with inadmissibility and deportability from the United States.

23.    Defendant Ricardo Wong (FOD Wong) is the ICE Field Office Director (FOD) for the Chicago Area of Responsibility ("Chicago AOR"), which includes Illinois, Indiana, Wisconsin, Kentucky, Missouri, and Kansas.  As part of his responsibilities, FOD Wong has oversight

responsibility for ICE detention contracts in the Chicago AOR and detention conditions at those facilities, including JCJC in Jefferson County, Illinois.

24.     Defendant Christopher L. McDaniels (COTR McDaniels) is the ICE Contracting Officer's Technical Representative (COTR) for the Jefferson County IGSA detention contract. Based on information and belief, COTR McDaniels was responsible for overseeing Jefferson County's performance under the contract.

25.     Defendant John Doe (ICE DSM Doe) is the ICE Detention Service Manager (DSM) for JCJC. As DSM, ICE DSM Doe is responsible to "review facility operations and identify operational or physical deficiencies . . . . [and] work with both facility and field office staff in order to gain or maintain compliance with the [detention standards]." ICE, Fact Sheet, "Detention Compliance Oversight" (Aug. 12, 2010).  On information and belief, ICE DSM Doe was onsite and oversaw detention conditions at JCJC two work weeks per month until the evacuation of the facility on or around November 30, 2012.

26.     Robert White (Chairman White) is the current Chairman of the County Board for Jefferson County, Illinois.  Chairman White's predecessor, Ted Buck, Sr., executed the IGSA detention contract with ICE to detain

immigrant detainees at JCJC. In his official capacity, Chairman White oversees Jefferson County's compliance with the IGSA contract.

27. Roger Mulch (Sheriff Mulch) is the Sherriff of Jefferson County, Illinois. On information and belief, Sheriff Mulch negotiated the IGSA detention contract with ICE to detain immigrants at JCJC. Sheriff Mulch is responsible for the county's day-to-day compliance with the IGSA contract.

28. Defendant Jefferson County is a local government entity located in the State of Illinois. The Jefferson County Justice Center is owned and operated by Jefferson County.

## FACTUAL AND LEGAL BACKGROUND

### *Immigration Detention and Regional Transfers of ICE Detainees*

29. Defendant ICE's use of JCJC to detain immigrants arises from ICE's increased reliance on detention as part of the enforcement of U.S. immigration law. In Fiscal Year (FY) 2003, ICE detained approximately 231,500 immigrants. By FY2011, the most recent year for which statistics are available, ICE detained approximately 429,000 immigrants—nearly doubling its annual detention population—making it the largest detention system in the United States.

30.     ICE relies heavily on delegating its detention responsibilities to state and local jails, through Intergovernmental Service Agreements (IGSAs).  In FY2012, ICE detained 71% of its daily detention population at state and local jails.

31.     While Plaintiffs have currently been removed from JCJC, they are still detained within the ICE Chicago AOR.  Plaintiffsface a substantial likelihood of return to JCJC as a result of the policies and practices of ICE of engaging in very frequent transfers of detainees, particularly detainees, like Plaintiffs, who are held in IGSAs.[1]

32.     The Chicago AOR detains on average, slightly over one thousand ICE detainees in six area jails (including JCJC) on any given day. Once an individual is detained in the Chicago AOR, per ICE policy, that individual will not be transferred outside of the area. ICE, "Policy 11022.1: Detainee Transfers" (effective Jan. 4, 2012), *available at* http://www.ice.gov/doclib/detention-reform/pdf/hd-detainee-transfers.pdf. (last visited Feb. 4, 2013).

33.     Plaintiffs, immigrant detainees within the Chicago AOR, have no control over their location of detention. ICE freely moves individuals

---

[1] See Human Rights Watch, Lo*cked Up Far Away: The Transfer of Immigrants to Remote Detention Centers in the United States* at 35-36 (2009) ("IGSAs originate and receive by far the most transferred detainees."); Dep't of Homeland Security, Office of Inspector Gen., "Immigration and Custom Enforcement's Tracking and Transfers of Detainees" (Mar. 2009).

between the six facilities used by ICE within the Chicago AOR, depending on available bed space, the schedule of court hearings, and other factors.

34.     For the five other detention facilities in the Chicago AOR, the most recent publicly available data reveals that 64-90% of detainees at those facilities, who were not released from ICE custody, were transferred to other facilities within the Chicago AOR.[2]

35.     Plaintiffs' experiences bear this out, for example, Plaintiff Rosiles has been transferred approximately 12 times between Chicago AOR detention facilities, Plaintiff Yusuf approximately 6 times, Plaintiff Padron approximately 3 times, Plaintiff Valdez approximately 3 times, and Plaintiff Rios approximately 2 times.

36.     Of all detainees in the Chicago AOR, excluding those detained by ICE's Omaha sub-office (whose cases are handled by Immigration Judges in Kansas City rather than in Chicago), over 10% are held in JCJC when it is being used.

---

[2] Transactional Records Access Clearinghouse (TRAC), *Detention Facility Reports: Transfers*, http://trac.syr.edu/immigration/detention/tran.shtml (finding that between April 2007 and March 2008, 90% of detainees at the Kenosha County Jail in Kenosha, WI who were not released from ICE custody were transferred to other facilities within the region; 89% at McHenry County Sheriff's Facility in Woodstock, IL; 85% at Dodge County Jail in Juneau, WI; 84% at Tri-County Jail in Ullin, IL; and 64% at Boone County Jail in Burlington, KY).

### ICE Detention Standards and DHS Appropriations Act of 2009

37. ICE's predecessor, the Immigration and Naturalization Service (INS), issued National Detention Standards (NDS), which ICE adopted upon its formation in 2002. ICE, "2000 Detention Operations Manual," *available at* http://www.ice.gov/detention-standards/2000/ (last visited Feb. 4, 2013).

38. ICE updated the NDS by issuing the Performance-Based National Detention Standards in 2008, ICE, "2008 Operations Manual ICE Performance-Based National Detention Standards" (2008 PBNDS), *available at* http://www.ice.gov/detention-standards/2008/ (last visited Feb. 4, 2013), and revised those standards in 2011, ICE, "2011 Operations Manual ICE Performance-Based National Detention Standards" (2011 PBNDS)," *available at* http://www.ice.gov/detention-standards/2011/ (last visited Feb. 4, 2013).

39. According to ICE, its 2011 PBNDS are the currently applicable standards for immigration detention.

40. Despite the issuance of detention standards, ICE has been under considerable scrutiny, both internally and externally, for its lack of oversight of its detention system and the deplorable detention conditions experienced by many of its immigrant detainees, including as it relates to inadequate medical care.

41.     In the spring of 2008, ICE came under public scrutiny regarding serious concerns with the adequacy of medical care in its detention system. Julia Preston and Amy Goldstein, WASHINGTON POST, "Careless Detention: Medical Care in Immigrant Prisons," (May 11-14, 2008); Scott Pelley, 60 MINUTES, "Detention in America" (aired May 11, 2008).

42.     In response, Congress held hearings to investigate detention conditions and the circumstances of medical care for immigrants. Hearing 110th Congress, 2nd sess., "Problems with Immigration Detainee Medical Care," before the House Judiciary Committee, Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law, June 4, 2008.

43.     Following these hearings, Congress placed restrictions on ICE's expenditure of detention funds in the DHS Appropriations Act of 2009. In particular Congress mandated:

> *Provided further*, That effective April 15, 2009, none of the funds provided under this heading may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than ''adequate'' or the equivalent median score in any subsequent performance evaluation system

Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, P.L. 110-329, Division D (Sept. 30, 2008). This requirement has remained in effect to the present.  Department of Homeland Security

Appropriations Act of 2010, P.L. 111-83 (Oct. 28, 2009); Continuing

Appropriations Act of 2011, P.L. 111-242 (Sept. 30, 2010); Consolidated

Appropriations Act of 2012, P.L. 112-74 (Dec. 23, 2011); Continuing

Appropriations Act of 2013, P.L. 112-75 (Sept. 30, 2012).

### *ICE/Jefferson County Inter-Governmental Service Agreement (IGSA)*

44.     At the time Congress enacted its requirement in the DHS

Appropriations Act of 2009, ICE was negotiating the IGSA contract with

Jefferson County, Illinois to house immigrant detainees at JCJC.

45.     In anticipation of the Jefferson County contract, ICE conducted

inspection reviews of JCJC in October 2006, June 2007, and September

2008.  JCJC failed all three ICE inspections. Ex. A.

46.     Despite the failed inspections and the congressional mandate

barring the use of funds for less than "adequate" facilities, ICE executed the

IGSA contract with Jefferson County on January 21, 2009. Ex. B. The

Jefferson County IGSA contract states:

> C. Consistent with Law: . . . This Agreement is permitted under
> applicable statutes, regulations, policies or judicial mandates.
> Any provision of this Agreement contrary to applicable statutes,
> regulation, policies or judicial mandates is null and void and
> shall not necessarily affect the balance of the Agreement.

*Id.*, Art. II.C.

47.     On March 9, 2009, ICE Headquarters in Washington, D.C. concurred in the deficient rating for JCJC and instructed the ICE Chicago Field Office: "This facility <u>shall not house</u> ICE detainees prior to the approval of the Plan of Action" (emphasis in original) to rectify the detention deficiencies. Ex. C.

48.     The first immigrant detainees arrived at JCJC on or around April 20, 2009—five days after the congressional mandate on detention conditions went into effect and before any "Plan of Action" was approved. Ex. D.

49.     The next ICE inspection review in September 2009 initially gave JCJC an "adequate" rating, despite a finding that "[c]leanliness in detainee cells, dayrooms, shower facilities, and toilets do not comply with sanitation requirements." Ex. E. That review was later downgraded to "deficient" in October 2009, but ICE still took no action to comply with the congressional mandate. *Id.*

50.     To ensure that Jefferson County provides the level of care ICE intends for its immigrant detainees, the IGSA stipulates:

**Article V.  DHS/ICE Detention Standards**

<u>Satisfactory Performance</u>:

[Jefferson County] is required to house detainees and perform related detention services in accordance with **the most current**

> **edition** of ICE National Detention Standards [broken
> hyperlink]. ICE Inspectors will conduct periodic inspections of
> the facility to assure compliance with the ICE National
> Detention Standards.

Ex. B. (emphasis added).

51.     Under the IGSA, Jefferson County was required to adhere to
the PBNDS 2008 and then transition to the PBNDS 2011.

52.     Jefferson County has never been in compliance with either
PBNDS 2008 or 2011. The Jefferson County Sheriff's Office has publicly
"recommended that the jail continue to follow the 2000 National Detention
Standards" and that "the facility not upgrade until it is required to do so in
order to save county money." Rorye O'Connor, *Sheriff Presents
Investigation Results*, Mt. Vernon Register News, Jan. 24, 2013, *available at*
http://register-news.com/local/x1303527999/Sheriff-presents-investigation-
results/print (last visited Feb. 4, 2013).

53.     ICE has never inspected the facility to evaluate compliance
with the standards of either the 2008 or 2011 PBNDS.


### Conditions at Jefferson County Justice Center

54.     At JCJC, immigrant detainees are housed dormitory-style, with
approximately 20 to 24 immigrant detainees per cell block.

55.     Sanitary conditions of JCJC are deplorable, particularly in the shower and restroom areas.

56.     There is visible mold, dirt and scum in the shower and restroom areas at JCJC. The facility's showers drain so slowly that dirty, standing water remains in the bathroom area for hours after the showers are used.

57.     Clothes and garbage are strewn throughout JCJC, particularly in the shower areas.

58.     Detainees are provided with "cleaning supplies" that consist of either merely water or water with an ineffectively small amount of cleaning agents.

59.     The paint on several of the walls at JCJC is chipped and falling off in large patches.  In some areas, the chipped paint gets into the ventilation system.

60.     Detainee uniforms and underwear at JCJC are extremely tattered and often not properly cleaned before being distributed to a new detainee.

61.     The recreation area is on occasion used to hold the overflow of detainees at JCJC. Detainees eat there and there is often food residue on the tables and floor.

62. As a result of the poor sanitation, skin funguses and rashes are widespread among detainees at JCJC.

63. The only access to drinking water at JCJC is from the bathroom sinks. The water from these bathroom sinks in the cell blocks is brown and has a putrid smell.

64. JCJC inmates suffer from dehydration as a result of refraining from drinking the water at the JCJC because of its foul taste and dangerous appearance.

65. Some detainees also refrain from bathing in JCJC showers because many individuals reported rashes after bathing in the water.

66. On at least one occasion during the last year, in September 2012, the water quality was so bad that, detainees were informed by JCJC officials that they could not drink the water because it was unsafe to do so due to a malfunctioning drainage system.

67. Following the announcement to detainees that the water was not safe to drink, they were provided with bottled drinking water for approximately two days.

68. After two days, detainees were no longer given bottled drinking water. When detainees asked about the bottled water, they were told by

JCJC staff that the tap water was again suitable for drinking. The tap water remained, however, discolored and foul smelling.

69.     The town of Mount Vernon, Illinois, where JCJC is located, has had problems providing safe drinking water to its residents. As a result, they have been frequently subject to water "boil orders," with at least 29 such orders since the end of March 2012.

70.     Plaintiffs and other ICE detainees were not informed of whether the boil orders applied to the water supply at JCJC.

71.     Plaintiffs and other ICE detainees had no ability to boil water before drinking it, nor was the water otherwise boiled before given to detainees to drink.

72.     JCJC has poor ventilation leading to poor air quality. At JCJC, detainees developed coughs and other respiratory problems. At times, so many detainees were coughing that it was hard for individuals to sleep.

73.     JCJC Detainees have limited access to sunlight and no outdoor recreation. On information and belief, JCJC is paying for construction of an outdoor recreation with money taken from detainees' own commissary accounts.

*Ongoing Lack of Medical Staffing Crisis at JCJC*

74.     Lack of medical staffing has been an ongoing crisis at JCJC.

75.     Based on information and belief, the same medical staff that provided care for the approximately 100 to 130 immigrant detainees per day, also provided the care for the other 120 inmates at JCJC.[3]

76.     As of one year ago, the medical staff consisted of: one physician, one physician's assistant, and 12 part-time nurses (working less than 1,000 hours in a given year).

77.     On information and belief, the JCJC doctor and the physician's assistant typically worked less than 10 hours a month.

78.     JCJC had 12 part-time nurses to start the year; but only four were still working as of June 2012. By October 2012, there were only two part-time nurses on staff.

79.     By December 2012, there was just one-part time nurse providing nearly all of the medical care to the daily detention population, which, on information and belief, consisted of nearly 250 individuals.

80.     In mid-November, the physician and physician's assistant tendered their resignations effective January 1, 2013—citing concerns of medical malpractice liability.

---

[3] On information and belief, non-immigrant detainees are still currently being held at JCJC.

81.     By November 2012, JCJC had become a breeding ground for communicable diseases.

82.     In addition to rampant respiratory infections and skin funguses, on information and belief, there were at least two immigrant detainees with live TB and three other immigrant detainees with serious, chronic medical conditions.

83.     Plaintiff Padron contracted methicillin-resistant Staphylococcus aureus (MRSA) while detained at JCJC.

84.     Padron repeatedly made requests for medical treatment for 6 days after he noticed a bump on his leg. He was told each time that it was nothing to worry about.

85.     Padron was later taken on an emergency basis to a local Jefferson County clinic to be treated.

86.     MRSA is a highly dangerous infection, because it is resistant to antibiotics. It tends to be found in locations such as prisons with poor hygiene.

87.      Plaintiff Padron continues to experience pain, discoloration and inflammation on his leg.

88.     Plaintiff Rosiles, who is HIV positive, failed to receive his required medication on three occasions. On each occasion, there was a lapse

of one week to 3 days. On the first occasion, he arrived from Boone County Jail without medication and was told at JCJC that they did not carry the medication he needed. Rosiles waited approximately 7 to 8 days to receive his medication.

89.     On the second occasion, Rosiles was told that JCJC had run out of his medication. Rosiles waited approximately 7 days to receive his medication.

90.     On the third occasion, Rosiles was again told that his medication had run out. He waited approximately 3 days to continue receiving medication.

91.     Failure to receive timely medication can weaken an already compromised immune system for an individual who is HIV positive.

92.     Plaintiff Yusuf, who suffers from high blood pressure, failed to receive his medication on several occasions for consecutive days. The medical staff, however, would sign the log, falsely stating that he had received the medication. In addition, the medical staff consistently failed to give Yusuf his full prescription, reducing his daily dosage from 150 milligrams to 50 milligrams.

93.     Plaintiff Valdez endured daily migraines while at JCJC. Only after repeated requests was Valdez allowed to see a doctor.

94.     Although the doctor prescribed medication for Plaintiff Valdez's migraines, Valdez never received the medication. Whenever he requested the medication, Valdez was informed that it had been ordered but had not arrived.

95.     Plaintiff Valdez stopped getting headaches once transferred out of JCJC.

96.     Plaintiff Rincon also experienced ongoing headaches at JCJC. Despite repeated requests for medication, he was never provided with any. Rincon was informed that the medication had "run out."

97.     Plaintiff Rincon stopped getting headaches once transferred out of JCJC.

98.     Plaintiff Ramirez was erroneously diagnosed with TB while at JCJC. As a result, he spent approximately one week in a filthy 24-hour isolation cell. Despite the TB diagnosis, Ramirez received no other follow-up medical treatment or consultation at JCJC. Once transferred to a different detention center, Ramirez was informed that the TB diagnosis was erroneous.

***Defendants' Were Aware of the Deplorable Conditions at JCJC***

99.     On information and belief, Sheriff Mulch provides day-to-day supervision of JCJC. On information and belief, medical staff raised concerns about medical and resource concerns at JCJC directly to the Sherriff and the Jefferson County Board, including medical staffing issues and malpractice concerns.

100.    Defendants Chairman White and Sheriff Mulch were on notice of the deplorable conditions for Plaintiffs and those similar situated by reviewing ICE jail annual and bi-monthly evaluations.

101.    On information and belief, ICE DSM Doe was at JCJC two weeks every month until the facility was evacuated on November 30, 2012.

102.    On information and belief, ICE DSM Doe observed the deplorable conditions and lack of adequate medical care on his bi-weekly visits to JCJC.

103.    On information and belief, ICE DSM Doe received complaints from detained individuals at JCJC regarding the deplorable conditions and lack of adequate medical care at JCJC.

104.    On information and belief, ICE DSM Doe reported to his Chicago AOR supervisors for the Jefferson County IGSA, including Defendants FOD Wong and COTR McDaniels, regarding the deplorable

25

conditions and chronic inadequate medical care suffered by Plaintiffs at JCJC.

### ICE Temporarily Evacuates Plaintiffs and Other Immigrant Detainees

105.   On or around November 30, 2012, after at least six months of a chronic medical staffing crisis and years of complaints regarding detainees' health and safety at JCJC, ICE decided to evacuate Plaintiffs and all other immigrant detainees from the facility.

106.   On information and belief, ICE evacuated all immigration detainees from JCJC within 36 hours, except for 3 with serious, chronic medical conditions, who were removed later that week.

107.   Plaintiffs Yusuf and Rosiles, were evacuated from JCJC on or around November 30, 2012 at 9:00 P.M. Plaintiffs Yusuf and Rosiles were transferred with approximately between 15 to 20 other immigrant detainees to Boone County Jail in Burlington, Kentucky.

108.   As they loaded into the bus, Plaintiffs Yusuf and Rosiles and other immigrant detainees observed that two detainees had surgical masks on. They soon learned from officials that the masked detainees had live tuberculosis (TB).

109.   Plaintiff Rosiles is HIV positive. The officers were aware that Rosiles was HIV positive and openly discussed Rosiles' status in front of the detainees.

110.   When detainees evacuated from JCJC on November 30, 2012 arrived at the Boone County Jail, two detainees with live TB were refused admission to the facility and they were ultimately transported elsewhere.

111.   Despite the deplorable detention conditions and chronic medical staffing shortages at JCJC, ICE has not terminated its IGSA contract with Jefferson County.

112.   Defendants intend to cause the return of Plaintiffs and other immigrant detainees to JCJC in the coming weeks, without adequately addressing the deplorable conditions at the facility. Defendants have made public statements to this effect.


## CLASS ALLEGATIONS

113.   While Plaintiffs have currently been removed from JCJC, they are still detained within the ICE Chicago Area of Responsibility (AOR), and face a substantial likelihood of return to JCJC.

114.   On information and belief, the evacuation of ICE detainees from JCJC is only temporary and ICE has not terminated the Jefferson County IGSA contract.

115.   Accordingly, Plaintiffs and the class of individuals they seek to represent face a substantial likelihood of being returned to JCJC.

116.   Plaintiffs seek to bring this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, and to seek prospective declaratory and injunctive relief. They propose a class of:

> All ICE detainees at risk of detention in the Jefferson County Justice Center as a result of being detained by ICE within the ICE Chicago AOR.

117.   Class action is proper for this litigation, because the class of persons described in Paragraph 116 above is so numerous that the individual joinder of all absent class members is impracticable. While the number of ICE detainees held in the Chicago AOR fluctuates, Plaintiffs believe that the proposed class is approximately 1,100 persons on any given day, and numbers in the tens of thousands in a given year.

118.   The claims set forth in this Complaint are common to each member of the class. Common questions of law or fact exist as to each of the proposed class members, including but not limited to:

a.     Whether federal law requires the Defendants ICE, FOD Wong, COTR McDaniels, ICE DSM Doe (collectively "ICE Defendants") to assess JCJC compliance with detention standards against the current PBNDS 2011 standards, rather than prior, superseded standards;

b.     Whether ICE Defendants violated and continue to violate federal law prohibiting them from detaining ICE detainees at a detention facility that received two consecutive "less than 'adequate'" inspection ratings;

c.     Whether the Jefferson County IGSA is null and void pursuant to Art. II.C. of the contract, because the contract violated the congressional mandate prohibiting the continuance of detention contracts at detention facilities with two consecutive deficient inspection ratings;

d.     Whether Defendants FOD Wong, COTR McDaniels, and ICE DSM Doe have conspired with Defendant Sheriff Mulch to violate federal law by detaining and continuing to detain ICE detainees at a detention facility that received two consecutive "less than 'adequate'" inspection ratings;

      e.      Whether Defendants FOD Wong, COTR McDaniels, and ICE DSM Doe have conspired with Defendants Sheriff Mulch and Chairman White to violate class members Fifth Amendment rights, including through deprivation of basic sanitation, access to safe drinking water, clean clothing, and outdoor recreation; exposure to poor ventilation and outbreaks of communicable diseases; and provision of inadequate medical care;

      f.      Whether Defendants Chairman White and Sheriff Mulch's (collectively "Jefferson Defendants") policies and practices lead to conditions which violate class members' Fifth Amendment rights, including deprivation of basic sanitation, access to safe drinking water, clean clothing, and outdoor recreation; exposure to poor ventilation and outbreaks of communicable diseases; and provision of inadequate medical care;

      g.      Whether Jefferson Defendants breached their contractual obligation to third-party beneficiary class members by failing to adhere to the PBNDS 2011;

      h.      Whether Defendant Jefferson County, Illinois's de facto as well as explicit policies, practices, and customs as to the treatment of class members at JCJC violate their Fifth Amendment rights.

119.   Plaintiffs are proper representatives of the proposed class, because they are members of the class described in Paragraph 116 above. The claims of Plaintiffs are typical of the claims of the class. Each Plaintiff has suffered the deplorable living conditions and lack of medical care at JCJC in violation of the federal Constitution, federal law, and all other applicable laws.

120.   Plaintiffs will fairly and adequately represent the interests of the members of the proposed class and have no interests in conflict with those of the proposed class. Plaintiffs have retained competent attorneys who are experienced in class action and complex litigation.

121.   The proposed class may properly be certified under Federal Rule of Civil Procedure 23(b)(2), because Defendants have acted in a manner generally applicable to the class as a whole, making final injunctive relief appropriate with respect to the class as a whole.

### FIRST CLAIM FOR RELIEF
### Against ICE Defendants
Administrative Procedures Act (APA), 5 U.S.C. §§ 706(1), (2)(A)-(C):
Agency Failure To Inspect JCJC Against Current Detention Standards

122.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 121.

123.   The DHS Appropriations Act of 2009 and its successors (collectively the "appropriations acts" or "appropriations statutes") preclude

ICE from "continu[ing] any contract for the provision of detention services" for facilities whose "overall performance evaluations" are found inadequate.

124.  ICE's Jefferson County IGSA states that Jefferson County "is required to house detainees and perform related detention services in accordance with **the most current edition** of ICE National Detention Standards…." (emphasis added).

125.  ICE policy as expressed in the 2011 PBNDS, the most current edition of ICE National Detention Standards, states that each standard under the 2011 PBNDS applies to IGSA facilities, including JCJC.

126.  ICE has never required JCJC to comply with the 2011 PBNDS.

127.  ICE has never audited or inspected JCJC against the 2011 PBNDS.

128.  JCJC is not in compliance with the 2011 PBNDS.

129.  The selective use of more lenient standards for the evaluation of JCJC, rather than the standard set forth by the Jefferson County IGSA contract and by ICE written policy, constitutes a conscious avoidance by ICE Defendants of the congressional prohibition of the use of deficient facilities such as JCJC.

130.  ICE Defendants' refusal to judge JCJC against the standard as set forth in the Jefferson County IGSA and ICE written policy frustrates the

purpose of the appropriations acts, of ensuring humane and adequate detention facilities for detainees.

131.   ICE Defendants' refusal to evaluate JCJC as required by the appropriations acts, the Jefferson County IGSA, and ICE written policy is agency action "unlawfully withheld or unreasonably delayed."

132.   ICE Defendants' refusal to evaluate JCJC as required by the appropriations acts, the Jefferson County IGSA, and ICE written policy is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in that it violates the letter and spirit of the governing appropriations statutes, ICE written policy, and the relevant IGSA.

133.   ICE Defendants' refusal to evaluate JCJC as required by the appropriations acts, the Jefferson County IGSA, and ICE written policy is "contrary to constitutional … power," insofar as the constitution places appropriations decisions in the hands of the legislature, and does not authorize executive expenditures in violation of such appropriations statutes.

134.   ICE Defendants' refusal to evaluate JCJC as required by appropriations acts, the Jefferson County IGSA, and ICE written policy is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in that it violates the letter and spirit of the governing appropriations statutes.

135.   Plaintiffs and putative class members are aggrieved parties who are threatened with imminent, irreparable injury, and have no adequate remedy at law. Plaintiffs therefore seek declaratory and injunctive relief, for themselves and others similarly situated, preventing ICE Defendants from future detention at JCJC.

### SECOND CLAIM FOR RELIEF
### Against ICE Defendants
Administrative Procedures Act (APA), 5 U.S.C. §§ 706(1), (2)(A)-(C):
Agency Failure to Adhere to the Appropriation Act Mandate

136.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 135.

137.   Despite the two consecutive deficiency ratings following inspection in June 2007 and September 2008, ICE Defendants' decision to continue to expend funds to continue the contract at JCJC was in violation of the DHS Appropriations Act of 2009 and its successors, which provided at all relevant times that "none of the funds provided under this heading may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than 'adequate.'"

138.   ICE Defendants have not effectuated any successor contract to the 2009 Jefferson County IGSA contract for which Congress forbade the continuance under the Appropriations Act of 2009.

139.   Detention of individuals subject to ICE custody at JCJC pursuant to the 2009 Jefferson County IGSA is unlawful and unauthorized by statute.

140.   ICE Defendants' failure to end the Jefferson County IGSA is agency action "unlawfully withheld or unreasonably delayed."

141.   ICE Defendants' decision to continue the Jefferson County IGSA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in that it violates the letter and spirit of the governing appropriations statutes.

142.   ICE Defendants' decision to continue the Jefferson County IGSA is "contrary to constitutional … power," in that the constitution places appropriations decisions in the hands of the legislature, and does not authorize executive expenditures in violation of such appropriations statutes.

143.   ICE Defendants' decision to continue the Jefferson County IGSA is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in that it violates the letter and spirit of the governing appropriations statutes.

144.   Plaintiffs and putative class members are aggrieved parties who are threatened with imminent, irreparable injury, and have no adequate remedy at law. Plaintiffs therefore seek declaratory and injunctive relief, for

themselves and others similarly situated, preventing ICE Defendants from any future detention at JCJC.

### THIRD CLAIM FOR RELIEF
**Against ICE Defendants**

Administrative Procedures Act (APA), 5 U.S.C. §§ 706(1), (2)(A):
Agency Action to Detain Plaintiffs Under Null And Void Contract

145.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 144.

146.    The Jefferson County IGSA contract states that any provision of the contract that is "contrary to applicable statutes, regulation, policies or judicial mandates is null and void."

147.    On or around April 20, 2009, Defendants started to detain immigrant detainees at JCJC, despite the two consecutive deficiency ratings in June 2007 and September 2008 that placed JCJC in violation of the congressional mandate.

148.    Accordingly, ICE Defendants detained Plaintiffs and other immigrant detainees at a detention facility, JCJC, for which the contract was null and void by operation of law.

149.    The Jefferson County IGSA continues to be null and void by the express terms of the contract.

150.    ICE Defendants' decision to continue to detain Plaintiffs and other immigrant detainees pursuant to the null and void Jefferson County IGSA is agency action "unlawfully withheld or unreasonably delayed."

151.    ICE Defendants' decision to continue to detain Plaintiffs and other immigrant detainees under the Jefferson County IGSA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in that it violates the express terms of the IGSA contract.

152.    Plaintiffs and putative class members are aggrieved parties who are threatened with imminent, irreparable injury, and have no adequate remedy at law. Plaintiffs therefore seek declaratory and injunctive relief, for themselves and others similarly situated, preventing ICE Defendants from any future detention at JCJC under the null and void Jefferson County IGSA.

### FOURTH CLAIM FOR RELIEF
### Against Defendants FOD Wong, COTR McDaniels, ICE DSM Doe and Sheriff Mulch
42 U.S.C. § 1983 civil conspiracy to violate the Appropriation Act Mandate

153.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 152.

154.    Despite the congressional mandate barring the continuation of contracts to detain immigrant detainees at detention facilities that receive "less than 'adequate'" ratings on two consecutive inspections, and despite the two consecutive deficiency ratings received in June 2007 and September

37

2008, in or about early 2009, Defendants FOD Wong, COTR McDaniels, ICE DSM Doe and Sheriff Mulch agreed and conspired with each other and others to detain immigrant detainees at JCJC. In furtherance of that conspiracy, the Defendants engaged in the acts stated below.

155.   The Jefferson County IGSA to detain ICE detainees at JCJC was executed in January 2009.

156.   In March 2009, ICE headquarters concurred in the September 2008 deficient rating and instructed that ICE detainees could not be housed at JCJC until a Plan of Action was implemented to correct the facility's deficiencies.

157.   Nevertheless, Defendants FOD Wong, COTR McDaniels, and Sheriff Mulch agreed with each other and others to detain ICE detainees at JCJC starting on or about April 20, 2009, in contravention of the congressional mandate that became effective April 15, 2009.

158.   On information and belief, Defendants FOD Wong, COTR McDaniels, ICE DSM Doe, and Sheriff Mulch intend to resume the detention of immigrant detainees at JCJC pursuant to the January 2009 contract in violation of the congressional mandate.

159.   As a proximate result of Defendants FOD Wong, COTR McDaniels, ICE DSM Doe and Sheriff Mulch's civil conspiracy to

circumvent federal law, Plaintiffs and those similarly situated have suffered, and will continue to suffer, considerable harm living in deplorable detention conditions without adequate access to medical care.

160.   Plaintiffs and putative class members are aggrieved parties who are threatened with imminent, irreparable injury, and have no adequate remedy at law.  The injunctive and declaratory relief sought by Plaintiffs, on behalf of themselves and those similarly situated, is necessary to prevent future injury.

**FIFTH CLAIM FOR RELIEF**
**Against Defendants FOD Wong, COTR McDaniels, ICE DSM Doe,**
**Chairman White and Sheriff Mulch**
42 U.S.C. § 1983 civil conspiracy to violate Fifth Amendment rights

161.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 160.

162.   Plaintiffs are civil detainees.

163.   The Fifth Amendment to the U.S. Constitution protects immigrant detainees from detention conditions that would constitute "punishment." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

164.   The protections of the Fifth Amendment apply equally to the states and all divisions and entities thereof, including county sheriffs' departments, prison and jail facilities and officers acting in their official capacities.

165.   Plaintiffs and the members of the putative class – as civil detainees - have a constitutional right to be free from detention conditions that would constitute punishment.

166.   By the facts and actions described above regarding the conditions of confinement at JCJC, Defendants Chairman White and Sheriff Mulch, through their actions, have subjected and will subject members of the proposed class to a serious deprivation of basic human needs, including through exposure to, infliction of and failure to address the following conditions:

   a.   unsanitary living conditions, particularly in the shower and bathrooms areas;

   b.   unclean drinking water;

   c.   poor ventilation;

   d.   tattered and soiled clothing;

   e.   no outdoor recreation or other meaningful access to fresh air and sunlight; and

   f.   inadequate medical care.

167.   As a result of the deplorable conditions of the facility, JCJC is a breeding ground for communicable diseases, including outbreaks of TB, MRSA, as well as respiratory infections and skin rashes and funguses.

168.   Making matters worse, Jefferson Defendants have failed to hire and retain proper medical staffing to properly care for a detention population of 200-plus detainees daily, and thousands of different detainees annually.

169.   These deprivations of basic human needs are serious and excessive, given that they pose serious harm or serious risk of harm to Plaintiffs and putative class members' health and safety.

170.   The Defendants Chairman White and Sheriff Mulch have actual personal knowledge of the situation of detainees in JCJC and the lack of adequate medical staffing.

171.   ICE DSM Doe was aware of the deplorable conditions and chronic inadequate medical care suffered by Plaintiffs at JCJC but conspired with Defendants Chairman White and Sheriff Mulch to continue to detain Plaintiffs at JCJC.

172.   On information and belief, Defendants FOD Wong and COTR McDaniels had personal knowledge regarding the deplorable conditions and chronic inadequate medical care suffered by Plaintiffs at JCJC. On information and belief, FOD Wong and COTR McDaniels, in furtherance of the conspiracy, failed to address the deplorable conditions and chronic inadequate medical care at JCJC.

173.   Despite having actual knowledge of the serious risks posed to the Plaintiffs and other immigrant detainees' health and safety, Defendants Chairman White, Sheriff Mulch, FOD Wong, COTR McDaniels, and ICE DSM Doe have agreed and conspired with each other and others to disregard those risks, taking little if any action to try to address the deprivations of the detainees' basic human needs brought about by the conditions of confinement.

174.   Defendants Chairman White, Sheriff Mulch, FOD Wong, COTR McDaniels, and ICE DSM Doe have knowingly disregarded conditions that constitute punishment to Plaintiffs and other putative class members, in depriving them of basic human needs.

175.   At all times, Defendants have acted in their official capacity under the color of state law.

176.   Defendants' actions have caused and will continue to cause Plaintiffs and putative class members great, immediate and irreparable harm if such actions are permitted to continue.

177.   Plaintiffs and putative class members are aggrieved parties who are threatened with imminent, irreparable injury, and have no adequate remedy at law.  The injunctive and declaratory relief sought by Plaintiffs, on

behalf of themselves and those similarly situated, is necessary to prevent future injury.

## SIXTH CLAIM FOR RELIEF
**Against Defendants White and Mulch (Jefferson Defendants)**
42 U.S.C. § 1983 Fifth Amendment Violation

178.  Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 177.

179.  Plaintiffs are civil detainees.

180.  The Fifth Amendment to the U.S. Constitution protects immigrant detainees from detention conditions that would constitute "punishment." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

181.  The protections of the Fifth Amendment apply equally to the states and all divisions and entities thereof, including county sheriffs' departments, prison and jail facilities and officers acting in their official capacities.

182.  Plaintiffs and the members of the putative class – as civil detainees - have a constitutional right to be free from detention conditions that would constitute punishment.

183.  By the facts and actions described above regarding the conditions of confinement at JCJC, Jefferson Defendants, through their actions, have subjected and will subject members of the proposed class to a

serious deprivation of basic human needs, including through exposure to,

infliction of and failure to address the following conditions:

      a.   unsanitary living conditions, particularly in the shower and

           bathrooms areas;

      b.  unclean drinking water;

      c.  poor ventilation;

      d.  tattered and soiled clothing;

      e.  no outdoor recreation or other meaningful access to fresh air

           and sunlight; and

      f.  inadequate medical care.

184.   As a result of the deplorable conditions of the facility, JCJC is a

breeding ground for communicable diseases, including outbreaks of TB,

MRSA, as well as respiratory infections and skin rashes and funguses.

185.   Making matters worse, Jefferson Defendants have failed to hire

and retain proper medical staffing to properly care for a detention population

of 200-plus detainees daily, and thousands of different detainees annually.

186.   These deprivations of basic human needs are serious and

excessive, given that they pose serious harm or serious risk of harm to

Plaintiffs and putative class members' health and safety.

187.   The Defendants Chairman White and Sheriff Mulch have actual personal knowledge of the situation of detainees in JCJC.

188.   Despite having actual knowledge of the serious risks posed to the Plaintiffs and other immigrant detainees' health and safety, Jefferson Defendants have disregarded those risks, taking little if any action to try to address the deprivations of the detainees' basic human needs brought about by the conditions of confinement.

189.   Jefferson Defendants have acted or failed to act in a manner that resulted in punishment to Plaintiffs and other putative class members, in depriving them of basic human needs.

190.   At all times, Jefferson Defendants have acted in their official capacity under the color of state law.

191.   Jefferson Defendants' actions have caused and will continue to cause Plaintiffs and putative class members great, immediate and irreparable harm if such actions are permitted to continue.

192.   Given Jefferson Defendants' past actions, combined with their refusal to address the deplorable conditions and chronic staffing shortages at JCJC, Jefferson Defendants will likely continue to act in a similar manner toward Plaintiffs and the members of the proposed class in the future.

193.   Plaintiffs and putative class members are aggrieved parties who are threatened with imminent, irreparable injury, and have no adequate remedy at law.  The injunctive and declaratory relief sought by Plaintiffs, on behalf of themselves and those similarly situated, is necessary to prevent future injury.

**SEVENTH CLAIM FOR RELIEF**
**Against Jefferson Defendants**

Breach of Contract: Failure to Adhere to the Applicable Detention Standards

194.   Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 193.

195.   The Jefferson County IGSA requires JCJC to be in compliance with the PBNDS 2011.

196.   ICE issued the PBNDS 2011 for the benefit of the health and safety of Plaintiffs and the members of the proposed class.

197.   Jefferson Defendant Sheriff Mulch publicly concedes that the facility is not in compliance with the PBNDS 2011 and in breach of its contractual obligations to third-party beneficiary Plaintiffs and putative class members as to the level of care required under the IGSA contract.

198.   As  a proximate result of Jefferson Defendants' breach of contract, Plaintiffs and other third party beneficiary putative class members

have suffered considerable harm living in deplorable detention conditions without adequate access to medical care at JCJC.

199.   Plaintiffs and putative class members are aggrieved parties who are threatened with imminent, irreparable injury, and have no adequate remedy at law.  The injunctive and declaratory relief sought by Plaintiffs, on behalf of themselves and those similarly situated, is necessary to prevent future injury.

**EIGHTH CLAIM FOR RELIEF**
**Against Defendant County of Jefferson**
42 U.S.C. § 1983 *Monell* Policy, Practice, Custom Claim

200.   Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 199.

201.   The powers of Jefferson County as a governmental body corporate are exercised by the Jefferson County Board.

202.   Defendant Jefferson County, acting at the level of official policy through its Board, commissioners, their agents and/or officials, condoned, authorized, tolerated, and institutionalized the unlawful conduct complained of by Plaintiffs.

203.   Defendant Jefferson County, through its Board, commissioners, their agents and/or officials, entered into and authorized the IGSA.

204.   On information and belief,  at all times material to this complaint, Defendant Jefferson County, through its Board, commissioners, their agents and/or officials, were aware of the deplorable conditions and chronic inadequate medical care suffered by Plaintiffs at JCJC.

205.   Defendant Jefferson County, through its Board, commissioners, their agents and/or officials, consciously decided to do nothing to address the deplorable conditions and chronic inadequate medical care suffered by Plaintiffs at JCJC, and had interrelated de facto policies, practices and customs which include, *inter alia*,

a.   Cutting costs at the expense of the individuals in ICE custody at JCJC;

b.   Failing to abide by the terms of the IGSA, including adherence to the 2011 PBDNS, resulting in deplorable conditions at JCJC which led to various physical ailments for individuals in ICE custody;

c.   Failing to adequately staff JCJC with the appropriate medical staff needed at the facility;

d.   Failing to adequately respond to the medical needs of individuals in ICE custody at JCJC.

206. Defendant Jefferson County's policies, practices and customs, both individually and together, were maintained and implemented in a manner that was punitive to civil immigrant detainees.

207. Jefferson Defendants' actions were made pursuant to and in accordance with de facto as well as explicit policies, practices and/or customs of defendant Jefferson County, its Board, commissioners, their agents and/or officials.

208. Moreover, constitutional violations suffered by Plaintiffs were directly and proximately caused by the official and tacit policies of authorized public officials for Jefferson County, Illinois.

209. Plaintiffs and putative class members are aggrieved parties who are threatened with imminent, irreparable injury, and have no adequate remedy at law. The injunctive and declaratory relief sought by Plaintiffs, on behalf of themselves and those similarly situated, is necessary to prevent future injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court:

a. Issue an order certifying this action to proceed as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b. Appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

c. Issue a judgment declaring that ICE Defendants violate federal law by failing to inspect JCJC by the most current detention standards;

d. Permanently enjoin the ICE Defendants from conducting any inspections of JCJC, except pursuant to the most current detention standards;

e. Issue a judgment declaring that ICE Defendants violate federal law by continuing the IGSA contract with Jefferson County, Illinois, after JCJC was found "less than 'adequate'" on two consecutive inspection ratings;

f. Issue a judgment declaring that ICE Defendants violate federal law by detaining Plaintiffs and putative class members at a facility for which the contract was null and void;

g. Issue a judgment declaring that Defendants FOD Wong, COTR McDaniels, and ICE DSM Doe have conspired with Defendant Sheriff Mulch to violate federal law by detaining and continuing to detain Plaintiffs and putative class members at JCJC after the facility received two consecutive "less than 'adequate'" inspection ratings;

h. Permanently enjoin the ICE Defendants from continuing to detain Plaintiffs and members of the putative class at JCJC pursuant to the extant IGSA;

i. Issue a judgment declaring that Defendants FOD Wong, COTR McDaniels, and ICE DSM Doe have conspired with Defendants Chairman White and Sheriff Mulch to deprive Plaintiffs and members of the proposed class their rights under the Fifth Amendment of the U.S. Constitution, federal law, and other applicable law;

j. Issue a judgment declaring that conditions in JCJC are such that they would and will subject Plaintiffs and putative class members to conditions of confinement that deprive Plaintiffs and members of the proposed class their rights under the Fifth Amendment of the U.S. Constitution, federal law, and other applicable law;

k.  Issue a judgment declaring the Jefferson Defendants in breach of their contractual obligation to the Plaintiffs and the putative Plaintiff class as third-party beneficiaries, by failing to provide detention conditions and care that are in compliance with the PBNDS 2011;

l.  Issue a judgment declaring that the implied and explicit policies, practices, and customs of Defendant County of Jefferson at JCJC are such as to violate the Fifth Amendment rights of Plaintiffs and the putative Plaintiff class;

m.  Permanently enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from detaining the Plaintiffs or members of the putative Plaintiff Class, unless and until Defendants have rectified the constitutional, statutory, and legal violations described herein;

n.  Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 2412, and other applicable law; and

o.  Grant such other relief as this Court deems just and proper.

Date: February 6, 2013                          Respectfully Submitted:


                                                   /s/ Claudia Valenzuela

Attorneys for Plaintiffs:

Claudia Valenzuela
Charles Roth
Mark Fleming
National Immigrant Justice Center
208 South LaSalle Street, Suite 1818
Chicago, Illinois 60604
T (312) 660-1308
T (312) 660-1613
T (312) 660-1628
F (312) 660-1505